**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Chapter 15 |
| ) | |
| Pacific Exploration & Production ) | Case No. 16-11189 (JLG) |
| Corporation, *et al.*,[1] ) | |
| ) | (Joint Administration Requested) |
| Debtors in a Foreign Proceeding. ) | |

**DECLARATION OF MICA J. ARLETTE IN SUPPORT OF**
**VERIFIED PETITION FOR ENTRY OF AN ORDER RECOGNIZING**
**FOREIGN MAIN PROCEEDINGS AND GRANTING ADDITIONAL RELIEF**

I, Mica J. Arlette, hereby declare:

1. I am a Senior Vice President, Corporate Advisory & Restructuring, with PricewaterhouseCoopers Inc., the court-appointed monitor and authorized foreign representative ("PwC" or the "Monitor") of Pacific Exploration & Production Company ("Pacific") and the other above-captioned debtors (collectively with Pacific, the "Debtors"), which are the subject of jointly-administered proceedings (the "Canadian Proceedings") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Ontario Superior Court of Justice (the "Canadian Court"), in Toronto, Ontario, Canada. I am fully authorized to act on behalf of the Monitor.

2. On April 27, 2016, the Canadian Court entered the Initial Order, a certified copy of which is attached hereto as **Exhibit A** (the "Initial Order"), commencing the Canadian Proceedings and, among other things, appointing PwC as the Monitor and the Foreign Representative and authorizing the filing of these chapter 15 cases (the "Chapter 15 Cases"). A

---

[1] The Debtors in the Canadian Proceedings are (i) Pacific Exploration & Production Corporation ("Pacific") (2064), (ii) Pacific E&P Holdings Corp. ("E&P Holdings") (2467), (iii) Meta Petroleum Corp. ("Meta") (2468), (iv) Pacific Stratus Energy Colombia Corp. ("Pacific Stratus") (7342), (v) PRE-PSIE Coöperatief U.A. ("PRE-PSIE") (1101), (vi) Pacific Stratus Energy S.A. ("Pacific Stratus Energy") (N/A), (vii) Pacific Off-Shore Peru S.R.L. ("Pacific Off-Shore Peru") (3118), (viii) Pacific Guatemala Energy Corp. ("Pacific Guatemala") (N/A), (ix) Pacific Rubiales Guatemala S.A. ("Pacific Rubiales Guatemala") (4280), (x) Petrominerales Colombia Corp. ("Petrominerales") (9614), (xi) Pacific Stratus International Energy Ltd. ("Pacific Stratus International") (0246), and (xii) Grupo C&C Energia (Barbados) Ltd. ("Grupo C&C Energia") (6765).

true and correct copy of the Affidavit of Peter Volk, the General Counsel of Pacific (the "<u>Volk Affidavit</u>") submitted to the Canadian Court in support of the Initial Order is attached hereto as **Exhibit B**. A true and correct copy of the Pre-Filing Report of the Proposed Monitor submitted by PwC to the Canadian Court in support of the Initial Order (the "<u>Pre-Filing Report</u>") is attached hereto as **Exhibit C**. The Pre-Filing Report was filed to provide the Canadian Court with details on PwC's qualifications to serve as Monitor and, based on PwC's work for the Debtors leading up to the commencement of the Canadian Proceedings, information relating to the Debtors' business, pre-filing activities, circumstances surrounding the negotiation of and entry into the restructuring support agreement, proposed postpetition financing and proposed Initial Order, among other things.

3. I submit this declaration in support of: (i) official form chapter 15 petitions for the Debtors; (ii) Verified Petition for Entry of Order Recognizing Foreign Main Proceeding and Granting Additional Requested Relief (the "<u>Verified Petition</u>"); (iii) the motion seeking joint administration of these Chapter 15 Cases (the "<u>Motion for Joint Administration</u>"); and (iv) the motion to establish certain notice procedures with respect to the above pleadings (the "<u>Notice Procedures Motion</u>").

4. PwC has been engaged by the Debtors since February 3, 2016. As a result of PwC's work with the Debtors leading up to the commencement of the Canadian Proceedings, I have become familiar with the Debtors' history, day-to-day operations, assets, financial condition, business affairs and books and records. All facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents including, among other things, the Volk Affidavit, the Pre-Filing Report, and any and all documents prepared and/or filed in connection with the Canadian Proceedings and the Chapter 15 Cases; (c)

information supplied to me by other employees of PwC, the officers, directors and employees of the Debtors or other professionals retained by the Debtors or the Monitor; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. I am an individual over the age of eighteen and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

## BACKGROUND

**I.    The Debtors' Business**

5.     The Debtors, together with their non-debtor subsidiaries, affiliates, and branches (collectively, the "Company") are an oil and natural gas enterprise involved in the exploration, development, and production of certain oil and natural gas interests, principally in Colombia, and, to a lesser extent, in other jurisdictions including Peru, Brazil, and Belize.

6.     The Company reported total sales of approximately $2.82 billion for the year ended December 31, 2015 from all of its operations. The Company is the largest independent oil and natural gas operator in Colombia in terms of production. Over the course of 2015, the Company's oil and natural gas properties produced on a gross basis on average 303,882 boe$^2$ per day, with an average daily net production (after royalties and payments to its joint venture partners) of 154,472 boe per day. The Company has informed me that as of September 2015, the total oil production from fields it operates represented 30% of total oil production in Colombia.

7.     The Company's operations have been significantly impacted by the dramatic decline in oil prices over the past 18 months (the WTI crude oil price has ranged from a high of

---

$^2$    Disclosure provided herein that is expressed in barrels of oil equivalent (boe) is derived by converting natural gas to oil in the ratio of five thousand seven hundred cubic feet (Mcf) of natural gas to one barrel (bbl) of oil. A boe conversion ratio of 5.7 Mcf: 1 bbl is based on an energy equivalency conversion method primarily applicable at the burner tip and does not represent a value equivalency at the wellhead. The Company expresses boe using the Colombian conversion standard of 5.7 Mcf: 1 bbl required by the Colombian Ministry of Mines and Energy for those properties located in Colombia. The Company expresses boe using the Peruvian conversion standard of 5.626 Mcf: 1 bbl required by Perupetro S.A. for properties in Peru.

$107.26 per barrel on June 20, 2014, to less than $27 per barrel in February 2016 and now currently in the range of $40 per barrel),³ the continued low prices of natural gas, and the overall general uncertainty in the energy market. Oil prices are expected to remain volatile. These macroeconomic factors, coupled with the Debtors' substantial debt obligations, forced the Debtors to explore various out-of-court restructuring options many months ago. Unfortunately, none of these efforts were able to sufficiently remedy the Debtors' financial troubles and the confluence of market and financial factors left the Debtors – like many other similarly situated exploration and production companies – with little choice but to commence the Canadian Proceedings. The Debtors' primary objective is to deleverage their capital structure in an organized manner that does not disrupt its ongoing business.

## II.     The Debtors' Capital Structure

8.     As of the Commencement Date, Pacific was the borrower of $5.32 billion in long-term unsecured debt (the "Financial Debt"). Each of the remaining Debtors (with the exception of Grupo C&C Energia) is a guarantor of all of the Financial Debt. The Financial Debt is comprised of (i) a revolving credit facility (the "Revolving Credit Facility") with an outstanding balance of approximately $1 billion, (ii) three separate term loan facilities (the "Term Loan Credit Facilities," and together with the Revolving Credit Facility, the "Credit Facilities") with a collective outstanding balance of approximately $215 million, and (iii) four different tranches of notes (collectively, the "Senior Notes") with a collective outstanding balance of approximately $4.1 billion.

9.     Further, in connection with its day-to-day operations, the Company is required to provide certain standby letters of credit (the "Letters of Credit") for regulatory obligations, such

---

³     "WTI" means West Texas Intermediate and is also known as Texas light sweet. It is a grade of crude oil used as a benchmark in oil pricing. It has been described as "light" because of its relatively low density, and sweet because of its low sulfur content. See https://en.wikipedia.org/wiki/West_Texas_Intermediate.

as the licenses granted by the National Hydrocarbons Agency of Colombia (Agencia Nacional de Hidrocarburos, or "ANH").[4] Prior to the Commencement Date, the Debtors had approximately $221 million in outstanding Letters of Credit, the vast majority of which had been obtained on an unsecured basis. These Letters of Credit were issued under a number of facilities with different financial institutions. None of the Letters of Credit were provided under the Revolving Credit Facility or the Term Loan Credit Facilities, except for the Bladex Term Loan Credit Facility.

10. Pacific's common stock is listed on the TSX under the symbol "PRE" and on the Colombian Stock Exchange under the symbol "PREC." As of early January 2016, Pacific's two largest shareholders were believed to be O'Hara Administration Co. S.A. (19.95%) and Alfa S.A.B. de C.V. (18.95%). Both of these shareholders had representatives that serve on Pacific's board of directors until April 27, 2016, when those directors resigned.

### III.    Events Preceding the Commencement of the Canadian Proceedings

11. As described above, the Debtors' deteriorating financial performance was a result of a liquidity crunch that has stemmed primarily from the significant market downturn in the price of oil and natural gas. As substantially all of the Company's revenues are derived from the extraction and sale of oil (approximately 90% of total revenue) and natural gas (approximately 10% of total revenue), these low prices have had a severe and detrimental impact on the Company.

12. In early 2015, as the decline in oil prices continued to worsen, the Company made a concerted effort to consider all of its strategic alternatives. Over the course of 2015, the

---

[4] Through its operating subsidiaries in Colombia and Branches, the Company holds indirect interests in certain hydrocarbon properties in Colombia through contracts and licenses with Ecopetrol S.A. ("Ecopetrol"), the Colombian majority state owned oil and natural gas company, and ANH, the Colombian national hydrocarbons agency. Preservation of the contracts with Ecopetrol and ANH is critical to the overall business. Indeed, the Company derives approximately 90% of its revenues from Colombian operations.

Company worked to reduce costs across the board. This included drastically restricting planned capital expenditures to all but the highest return and most material near-term projects, which resulted in a reduction of its capital expenditures from approximately $2.4 billion in 2014 to just $726 million in 2015.

13. Still, given the continuing decline in international oil prices, the Company concluded that its existing capital structure was unsustainable and that it had liquidity concerns that operational changes and/or near term sales could not respond to. Therefore, the Company hired Lazard Frères & Co. LLC and Lazard Asesores Financieros, S.A. (together, "Lazard") as financial advisors, which determined in early January 2016 that the Company's cash flow would not be sufficient to meet operations in the near term.

14. To enable negotiations with its bank lenders, and resolve an impending covenant default, on September 28, 2015, the Company obtained 90-day waivers from its bank lenders for the Net Worth Covenant under the Revolving Credit Facility and the Term Loan Credit Facilities.

15. During the 90-day waiver period, Bank of America, acting in its capacity as administrative agent under the Revolving Credit Facility, organized a steering committee of lenders, including lenders under the Revolving Credit Facility and lenders under each of the Term Loan Facilities (the "Bank Steering Committee").

16. The Bank Steering Committee first met with members of the Company's management and the Company's U.S. bankruptcy counsel and financial advisor on December 15, 2015, to discuss the Company's request for an extension of the September 28, 2015 waivers.

17. On December 28, 2015, the Company procured additional waivers from each of the bank lenders through February 26, 2016, subject to certain milestones that the Company was

required to meet (the "December 28th Waivers").  During the waiver period, the banks engaged with the Company in discussions regarding the Company's concerns, business plans and financing needs.  Throughout the waiver period, the banks amended the December 28th Waivers to extend or otherwise waive various deadlines under those waivers.

18. On January 14, 2016, the Company announced: (i) it would not make the interest payments under certain of its senior note obligations due January 19 and 26, 2016, thereby triggering the 30-day grace period (the "Grace Period") thereunder; (ii) it would use the Grace Period to engage with its bank lenders and holders of the Senior Notes in an effort to reach a consensual restructuring of its Financial Debt; and (iii) it had reached an agreement with its bank lenders to amend the December 28th Waivers to extend the deadline to reach an agreement on a minimum liquidity covenant to January 21, 2016 from January 14, 2016.  On January 21, 2016, the deadline to reach an agreement on a minimum liquidity covenant was further extended to February 4, 2016.

19. During the week of January 18, 2016, the Debtors interviewed potential candidates for the role of Monitor, to prepare for the possibility that a proceeding under the CCAA might become necessary.  On February 3, 2016, the Debtors retained my firm, PwC, for this purpose.

20. Concurrently with the discussions amongst Pacific, the Ad Hoc Noteholder Committee (defined below) and the banks under the Credit Facilities (the "Banks"), the Company also initiated frequent communication with the *Superintendencia de Sociedades de Colombia* (the "Superintendencia"), to determine the Superintendencia's position in respect of the Company's process. The Superintendencia is the regulatory body that oversees insolvencies in Colombia.  Under Colombian law, the Superintendencia has the authority to take control of

local Colombian branches and/or initiate reorganization proceedings in respect of such branches if the Superintendencia is of the view that their Colombian operations are in imminent financial danger.

21. On February 18, 2016, the Company executed an extension agreement (the "Notes Extension Agreement") with an ad hoc committee (the "Ad Hoc Noteholder Committee") of certain noteholders of, *inter alia*, under the 5.625% Senior Notes due in 2025 (the "2025 Notes") and 5.375% Senior Notes due in 2019 (the "2019 Notes"), pursuant to which such holders agreed to forbear from declaring the 2019 Notes and 2025 Notes due for failure to pay the required interest. The Notes Extension Agreement originally expired on March 31, 2016. On February 19, 2016, the Company entered into forbearance agreements with its lenders under the various credit facilities (the "Lender Forbearance Agreements") through March 31, 2016. On March 23, 2016, the termination dates under the Lender Forbearance Agreements and the Notes Extension Agreement were extended to April 29, 2016.

22. In late February 2016, Lazard commenced a formal process on the Company's behalf to solicit interest from prospective investors with respect to either (i) an acquisition of all or part of Pacific's assets; or (ii) an investment to effect a restructuring. Since some of the proposals were from parties with some connection to members of the board (including from The Catalyst Capital Group Inc. ("Catalyst"), which has the support of the Company's co-chairs[5]), Pacific's board (the "Board") formed a four member independent committee to lead the bid process, evaluate the proposals, and make recommendations to the full board regarding the restructuring proposals received (the "Independent Committee"). Through their advisors, and pursuant to the terms of the Forbearance Agreements, the Ad Hoc Noteholder Committee, the

---

[5]   It is my understanding that the co-chairs have no financial interest in the transaction with Catalyst.

Banks, the Superintendencia and Independent Committee had input into the design and implementation of this process. The Monitor was not involved in the design and implementation of this process. Through this process, the Company received six (6) offers from bidders, which were reviewed by the aforementioned parties. The bidders were also involved in two (2) rounds of meetings in New York. The meetings included representatives of the Company, the Ad Hoc Noteholders Committee, the Banks, and the Independent Committee. The Monitor participated, as an observer, and became involved in this process in the second round of meetings, which occurred from March 30, 2016 to April 1, 2016.

23. After several weeks of intense effort, negotiation and deliberation with potential investors and attorneys and financial advisors for the holders of the Financial Debt, ultimately on April 5, 2016, the Independent Committee met in hopes of selecting a bid to recommend to the Board. At that meeting, the Independent Committee was informed that the Ad Hoc Noteholder Committee and management of Pacific had all supported one proposal in particular—the bid submitted by Catalyst. On April 13, 2016, the Independent Committee recommended to Pacific's board that the Company consummate a transaction with Catalyst.

24. In general terms, the proposed restructuring transactions contemplate, among other things:

(a)   a Chief Restructuring Officer will be appointed during the CCAA process;

(b)   that the Debtors will be reorganized pursuant to a plan of arrangement and compromise (a "Plan"), which will be filed in the Canadian Proceedings to implement the restructuring;

(c)   the DIP loan providers will provide $500 million of senior secured first-lien debtor-in-possession financing (the "DIP Note Facility") provided in two tranches, one by Catalyst and the other by a group of Noteholders, and a $134 million letter of credit facility (the "DIP L/C Facility" and together with the DIP Note Facility, the "DIP Facilities") will be made available to the Debtors by a group of the Banks;

(d) the $250 million tranche of the DIP Note Facility offered by the Noteholders will stay in as 'exit financing' after the Restructuring is complete (assuming that the Plan is approved), whereas the $250 million tranche of the DIP Note Facility offered by Catalyst will be exchanged for Reorganized Common Stock (again, assuming that the Plan is approved[6]);

(e) after Catalyst's exchange for Reorganized Common Stock and the provision of Reorganized Common Stock as consideration for providing the DIP Note Facility, the remaining Reorganized Common Stock will be available to Affected Creditors[7] under the Plan, if approved; and

(f) up to an additional $200 million will be provided by Catalyst to fund a "Cash Out Offer" that will permit Affected Creditors to receive cash in lieu of the Reorganized Common Stock which they would otherwise receive.[8]

## IV. The Canadian Proceedings

25. Despite the Company's best efforts to consider all available out-of-court restructuring alternatives (including cost-cutting measures, obtaining certain debt covenant waivers, and analyzing favorable asset sale opportunities), the Company determined that the commencement of the Debtors' Canadian Proceedings, together with Colombian insolvency proceedings under Law 1116 by certain Colombian companies and branches of the Debtors, was the best alternative, and in the Debtors' best interests, as well as the best interests of their creditors and other parties in interest.

26. Consequently, the Debtors commenced the Canadian Proceedings to restructure the Debtors' finances while continuing normal operations under the protections offered by the

---

[6] As set forth in the Recapitalization Term Sheet, without taking into account the Cash Out Offer or Early Consent Consideration, the allocation of Reorganized Common Stock are estimated to be, each on a fully diluted basis: 29.3% to Catalyst (including Reorganized Common Stock upon exercise of warrants); 12.5% to DIP Note Purchasers other than Catalyst (consisting of Reorganized Common Stock upon exercise of warrants); and 58.2% to Affected Creditors.

[7] The affected creditors under the Plan (the "Affected Creditors") will be the Noteholder claims and the Banks' claims, although there is a provision that allows the Company to treat "unknown, unreported, contingent or contested" claims as Affected Claims, together with restructuring claims from, for example, the repudiation of contracts.

[8] The Recapitalization Term Sheet and the DIP Term Sheets for the DIP Note Facility and DIP L/C Facility are attached as Exhibits J, M, and O respectively, to the Volk Affidavit, which is attached hereto as Exhibit B.

CCAA.  The Canadian Court entered the Initial Order commencing the Canadian Proceedings on April 27, 2016.  The Initial Order, among other things, appointed PwC as the Foreign Representative and Monitor in the Canadian Proceedings.  In addition, the Initial Order granted stay protection to the Debtors.

27. The Monitor, in its capacity as duly authorized Foreign Representative, is now commencing these Chapter 15 Cases to seek the assistance of this Court in recognizing and giving effect in the United States to the orders of the Canadian Court entered in the Canadian Proceedings, including the Initial Order.

## MOTIONS

28. In furtherance of the above-outlined objectives, the Monitor has filed certain motions and proposed orders and respectfully requests that the Court consider entering the proposed orders granting such motions.  I have reviewed each of the motions and proposed orders (including any exhibits thereto) and the facts set forth there are true and correct to the best of my knowledge, information and belief.

### A. The Verified Petition

29. The Monitor has filed, concurrently herewith, the Verified Petition, which seeks final relief in aid of the Canadian Proceedings and recognition and enforcement in full of the Initial Order in the United States.  As set forth in the Verified Petition, this Court should recognize the Canadian Proceedings as "foreign main proceedings," as defined in section 1502(4) of title 11 of the United States Code (the "Bankruptcy Code").[9]  First, these Chapter 15 Cases have been commenced by a duly authorized foreign representative.  In addition, the Bankruptcy Code provides for recognition of a foreign proceeding as a "foreign main

---

[9] As further described in the Verified Petition, in the alternative, this Court should recognize the Foreign Proceedings of the Non-Canadian Debtors (as such term is described in the Verified Petition) as "foreign non-main proceedings," as defined in section 1502(5) of the Bankruptcy Code.

16-11189-jlg    Doc 4    Filed 04/29/16    Entered 04/29/16 18:23:50    Main Document
Pg 12 of 20


proceeding" if such foreign proceeding is a "foreign proceeding" pending in the country where the debtor has its "center of main interests." See 11 U.S.C. § 1517(b)(1).

30.     PwC is an entity that has been authorized by the Canadian Court to monitor the business and financial affairs of the Debtors with the powers and obligations set out in the CCAA and the Initial Order. The Initial Order, among other things, (a) appointed the Monitor as Foreign Representative and directs the Monitor to commence these Chapter 15 Cases, and (b) requested that all courts make such orders and provide assistance to the Monitor as may be necessary and desirable to give effect to the Initial Order. See (Initial Order, ¶¶ 68-69.) It is my understanding that for these reasons, PwC satisfies the definition of a "foreign representative" as that term is defined in section 101(24) of the Bankruptcy Code.

31.     The Canadian Proceedings are "foreign proceedings" as they are a collective judicial proceeding authorized and supervised by the Canadian Court under the CCAA and pursuant to the Initial Order. It is my understanding that for these reasons, the Canadian Proceedings qualify as "foreign proceedings" as that term is defined in section 101(23) of the Bankruptcy Code. In compliance with section 1515(b) of the Bankruptcy Code, a certified copy of the Initial Order, which commenced the Canadian Proceedings, is attached hereto as Exhibit A.

32.     The Debtors' "center of main interest" is clearly in Canada as (a) two of the Debtors (including the parent Pacific) are incorporated in Canada and both of their registered offices are located in Canada; (b) Pacific is a public company traded on the Toronto Stock Exchange and must comply with the reporting requirements of Canadian Securities Administrators (which serves the same role as the Securities and Exchange Commission in the United States); (c) Pacific has approximately 45 employees in Canada and pays payroll taxes to

the Canadian government; (d) Pacific's board of directors regularly holds its meetings in Canada and a member of Pacific's board of directors is Canadian; (e) the members of the boards of each of Pacific's subsidiaries include members of Pacific's board; (f) senior management and personnel who perform certain centralized administrative functions for the entire enterprise are located in Canada, including their global tax planning, legal and financial reporting; (g) the Company's enterprise-wide cash management system revolves around its main concentration account located in Canada, through which funds are concentrated from subsidiaries and disbursed to them as required to fund local costs, at the direction of Canadian treasury managers; (h) as the public parent corporation of the entire enterprise, Pacific has been the main corporate vehicle through which financing has been raised for the operations of the enterprise, including the other Debtors; and (i) all the Debtors' cases in Canada under the CCAA are being jointly administered.

33. Based on these facts, it is my understanding that the Debtors' center of main interest is in Canada and the Canadian Proceedings are therefore foreign main proceedings as that term is defined in section 1517(b)(1) of the Bankruptcy Code.

**B. Motion for Joint Administration**

34. Joint Administration is warranted in these Chapter 15 Cases. The Debtors are affiliated entities with closely related financial affairs and business operations, and joint administration will ease the administrative burden on the parties and this Court and its personnel. The Monitor anticipates that various notices, applications, motions, other pleadings, hearings and orders in these cases will affect each of the Debtors. The failure to administer these Chapter 15 Cases jointly would result in duplicative pleadings and service. Such duplication would impose unnecessary expenses on all parties.

35. Joint administration will permit this Court to use a single docket for the jointly administered cases and combine notices to creditors and other parties in interest. Joint administration will protect parties in interest by ensuring that they will be apprised of all matters. Accordingly, I believe entry of an order granting the relief requested in the Motion for Joint Administration is in the best interest of the Debtors and all parties in interest.

C. **Notice Procedures Motion**

36. The relief sought in the Notice Procedures Motion is warranted in these Chapter 15 Cases. The Debtors have a significant number of creditors, potential creditors, and other parties in interest, all of which will need to be provided with notice of, among other things, the filing of these Chapter 15 Cases, the deadline to object to the recognition of these Chapter 15 Cases, and the hearing date for recognition of these Chapter 15 Cases. I believe the notice procedures set forth in the Notice Procedures Motion represent a cost-effective method for the Monitor to effectively handle service in these Chapter 15 Cases. Accordingly, I believe entry of an order granting the relief requested in the Notice Procedures Motion is in the best interest of the Debtors and all parties in interest.

**STATEMENT PURSUANT TO BANKRUPTCY CODE SECTION 1515(c)**

37. I understand Bankruptcy Code section 1515(c) provides "[a] petition for recognition shall . . . be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative." In accordance with this section, I hereby declare the only foreign proceedings, as I understand such term is defined in Bankruptcy Code section 101(23), pending with respect to the Debtors that are known to the Debtors are the Canadian Proceedings. In addition, coordinated restructuring proceedings in Colombia under Ley 1116 of 2006 are intended to be commenced before a Colombian court of competent jurisdiction with respect to the Debtors' three Branches.

**INFORMATION PURSUANT TO BANKRUPTCY RULE 1007(a)(4)**

38.   I understand Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure provides "[i]n addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition . . . shall file with the petition: (A) a Corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is sought under § 1519 of the Code." In accordance with this rule, I hereby provide the following information:

39.   <u>Corporate Ownership Statement</u>.  In accordance with Rule 7007.1, the following corporations directly or indirectly own 10% or more of Pacific's equity interests: O'Hara Administration Co. S.A. (19.95%), Alfa S.A.B. de C.V. (18.95%), Trafigura Beheer BV (10.01%).  Further, the following corporations directly own 10% or more of the remaining Debtors' equity interests: (i) Pacific Stratus International is 100% owned by Pacific; (ii) Pacific Stratus Energy is 100% owned by Pacific Stratus International; (iii) Pacific Guatemala is 100% owned by Pacific Stratus International; (iv) Pacific Off-Shore Peru is 99.99% owned by Pacific Stratus Energy; (v) Pacific Stratus is 100% owned by Pacific Stratus International; (vi) E&P Holdings is 100% owned by Pacific Rubiales International Holdings, S.a.r.l; (vii) Meta is 100% owned by E&P Holdings; (viii) PRE-PSIE is 99.9% owned by Pacific; (ix) Pacific Rubiales Guatemala is 99.94% owned by Pacific Guatemala; (x) Petrominerales is 100% owned by Petrominerales Bermuda, Ltd.; and (xi) Grupo C&C Energia is 100% owned by C&C Energia Holding SRL.

40. <u>Persons/Bodies Authorized to Administer the Foreign Proceedings</u>. Per Exhibit A, PwC was appointed as the Debtors' foreign representative. My office address is: 18 York Street, Suite 2600, Toronto, Ontario M5H 2R2 Canada.

41. <u>Pending Litigation/Provisional Relief</u>. The only litigation I am aware of in the United States to which the Debtors are a party is an arbitration proceeding currently underway in New York between Pacific Stratus Energy Colombia Corp. and Consorcio Golfo del Morrosquillo that began on September 2, 2015 under the case number 21307/ASM. The Debtors have not sought provisional relief against any entities.

*[Signature Page to Follow]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: April 29, 2016

/s/ Mica J. Arlette
PricewaterhouseCoopers Inc.
By: Mica J. Arlette
Title: Senior Vice President

# **EXHIBIT A**

**Certified Copy of the Initial Order**

# **EXHIBIT B**

**Affidavit of Peter Volk**

# **EXHIBIT C**

**Pre-Filing Report**